**FOGGY BOTTOM ASSOCIATION,**
**Petitioner,**

v.

**DISTRICT OF COLUMBIA ZONING**
**COMMISSION, Respondent,**

**International Monetary Fund, Intervenor.**

**Nos. 92–AA–635, 92–AA–1188.**

District of Columbia Court of Appeals.

Argued Dec. 8, 1993.

Decided March 15, 1994.

er contends that the Commission erred in approving the modification in the absence of a change in circumstances that would warrant releasing the IMF from obligations imposed by the Commission as a condition for approval of a previous modification to the planned unit development. Petitioner maintains that the Commission failed to articulate its reasoning for overriding a previous Commission decision providing an important public benefit to the neighborhood, namely a mini-park. In petitioner's view, the proposed linear landscaping is a poor substitute for the mini-park given the excessively large proposed development and the fact that the enlarged Visitors' Center does not provide additional benefits to the public. Petitioner also cites error in the Commission's refusal to consider its argument that the relocation of an adjacent church with its homeless feeding program would have a detrimental effect at the new site. Finally, petitioner contends that the Commission's key findings are not supported by substantial evidence and that the Commission erred in denying petitioner's motion for reconsideration. Finding these contentions unpersuasive, we affirm.

Richard B. Nettler, Washington, DC, for petitioner.

John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the Memorandum in Lieu of Brief, for respondent.

Whayne S. Quin, with whom Louis P. Robbins and John T. Epting, Washington, DC, were on the brief, for intervenor.

Before ROGERS, Chief Judge, and STEADMAN and FARRELL, Associate Judges.

ROGERS, Chief Judge:

This appeal challenges the Zoning Commission's approval of a modification of a planned unit development for the International Monetary Fund. Specifically, petition-

## I.

The Zoning Commission has approved three applications of the International Monetary Fund in connection with a planned unit development (PUD) on the south side of the 1900 block of H Street, N.W. Only the last, Phase III, is at issue in the instant appeal.[1]

*Phase I.* In 1969 the Zoning Commission approved the original application of the International Monetary Fund (IMF) for a PUD in Square 120. The application called for rezoning of the property—bounded by G, H, 19th, and 20th Streets, N.W.—from R–5–C (medium/high density general residential) to C–3–B (medium/high density mixed use commercial) and for construction of a building 130 feet in height with a floor area ratio (FAR) of 6.0.[2] The Commission approved

---

1. *See* 11 DCMR § 2406.7 (1991) (Commission may direct that planned unit developments proceed in phases).

2. As a result of a redesignation of zoning classification by the Commission, C–3–B became C–3–

C. *See* 27 D.C.Reg. 2226 (1980). Thus, the IMF's headquarters is currently zoned C–3–C which has an FAR guideline for PUDs of 7.0.

the April 3, 1969, committee report, which stated that the IMF was at its present site by decision of the United States government in 1946, and that as the IMF had grown, five changes in the zoning of its property had been approved. Further, the report noted that the IMF had determined that the accumulated investment in its present site made impractical moving the entire operation to another site. The approved FAR in Phase I was 7.0. Property owned by the Western Presbyterian Church on Lot 826 in Square 120 remained zoned residential.

*Phase II.* In 1980, the Zoning Commission approved the IMF's application to modify the PUD in order to construct an addition to the existing building since the IMF had been unable to acquire the church property in Lot 826.[3] The addition to the existing building had an FAR of 7.676, in excess of PUD regulatory guidelines of 7.0 FAR for a C–3–C property.[4] The Commission based its approval of the increased FAR in part on the public benefits to be provided by the IMF, including a mini-park at the southeast corner of the property.[5] The Commission found that had the IMF been able to build to an FAR of 7.0 over the entire site as contemplated in 1969, the IMF could have built 798,498 square feet, while under Phase II the IMF was proposing to build a total of only 754,535 square feet. The Commission further found that construction of the addition would "[c]oncentrat[e] development in a single, 130 foot addition rather than two separate lower additions[, and] will create substantial public open space and attractive urban design."

*Phase III.* In 1991, the IMF sought approval of a further modification of the PUD. This occurred following the IMF's acquisition of the church property in 1990 pursuant to an agreement whereby, in exchange for the property in Lot 826, the IMF would provide the church with a new church building at 24th Street and Virginia Avenue, N.W.

The IMF's Phase III application sought approval to rezone the church property from residential to commercial and to construct an addition to the existing headquarters building, for a total of 1,034,884 square feet. The proposed addition would be 130 feet in height and have an FAR of 10.11, giving the entire structure, including the existing expanded building, an FAR of 9.07. The application also sought to eliminate the mini-park, to close the alley separating the IMF building from the church property, and to redesign the 19th Street entrance to the existing building. In exchange, the IMF proposed to landscape the property in a way that, it maintained, would make the property more accessible to pedestrians. As an additional public benefit, the IMF proposed to triple, in above-grade space, the size of the Visitors' Center, which provides educational opportunities and special exhibits to the community.

The Commission granted preliminary approval of the Phase III modification and scheduled a public hearing.[6] At the hearing, those in opposition maintained that the proposed amenities and public benefits were insufficient to justify the increase in FAR, noting that the National Capitol Planning Commission had reported that Phase III should "contain additional public amenities, including mixed uses at the ground floor level," and should "be more responsive, in terms of its bulk, mass, and scale, to surrounding land uses and development." Witnesses also referred to the report of the D.C. Office of Planning, which stated that in order to ensure "a true net gain in amenities affecting the nearby residential community," the IMF "should seriously consider a broader amenities package" and suggested that the IMF subsidize a homeless feeding program

---

3. The Commission order noted that the IMF had, at that time, abandoned efforts to acquire the church's property and to close the adjacent alley as planned, because the church intended to continue its ministry at its present location.

4. *See* 11 DCMR § 2403.10 (1991).

5. Other public benefits were a public reading room and an exhibit room. The Phase II order

also referred to other amenities, including a set back around the IMF building of over 16,000 square feet, landscaping and maintenance of open space, quality of design and materials used in the building, and quality of urban design.

6. *See* 11 DCMR § 2405.2 (1991) (public hearing must be held before granting PUD approval).

in an appropriate commercial area or incorporate such a facility in its headquarters. The witnesses in opposition also expressed concern about the adverse impact of the relocation of the church's feeding program from a commercial-mixed use to a residential neighborhood.

The Commission approved the Phase III modification, making findings of fact on each issue raised at the hearing except the impact on the residential neighborhood of relocating the church, concluding that this issue was not properly before it. The Commission denied petitioner's motion for reconsideration or rehearing, and petitioner appealed.

**II.**

Acknowledging the limited nature of the court's review of the Commission's order,[7] petitioner nevertheless maintains that the order approving Phase III must be reversed because the "compromise of interests among developers, business, citizens, and municipality," *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n*, 426 A.2d 327, 336 (D.C.1981), required for a PUD's loosening of zoning restrictions, while evident in Phase I and Phase II, is absent from the Commission's Phase III order. In petitioner's view, the increased height and density approved by the Commission in Phase II were conditioned upon the fact that the IMF was unable to acquire the church property, as originally envisioned in the Phase I application, and on the IMF's promise to maintain a public park adjacent to the church for the benefit of the community. Further, petitioner contends, the Commission's Phase I and Phase II orders made clear that the appro-

priate FAR for the IMF's PUD remained 7.0. Petitioner concludes, therefore, that the IMF did not meet its burden of showing changed circumstances warranting a modification of the Phase II PUD to yield an overall FAR of 9.07, and that the only rationale for approval of the Phase III modification is the desire to have IMF employees in a single building that is close to related organizations.

Under the zoning regulations, all modifications to approved PUDs, other than "minor" modifications,[8] are to be treated as second-stage applications.[9] Thus, the Commission must hold a public hearing on an application for a major PUD modification, which application must be in accord with "the intent and purpose of the Zoning Regulations, the PUD process, and the preliminary approval."[10] Hence, under the regulations for second-stage applications, the requirements for preliminary approval of the original PUD remain in effect when the Commission is considering approval of a major PUD modification.[11] The Commission concluded that the IMF could meet its burden of proof by demonstrating that the amenities and public benefits in Phase III continued to provide an adequate exchange for the increased density in a manner that was consistent with the original PUD proposal approved in Phase I. That interpretation of the above regulations is reasonable. *See Blagden Alley Ass'n v. District of Columbia Zoning Comm'n*, 590 A.2d 139, 142–43 (D.C. 1991) (Commission has broad authority to interpret and apply zoning regulations); *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n*, supra note 7, 355

7. Petitioner cites *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n*, 355 A.2d 550, 560 (D.C.), *cert. denied*, 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334 (1976); *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n*, 431 A.2d 560, 566–67 (D.C.1981).

8. *See* 11 DCMR § 2407.6(a)–(d) (1991) (defining a "minor" modification as (a) a two percent or smaller change in height, percentage of lot occupancy, or gross floor area of a building; (b) a two percent or smaller change in the number of rooms or gross floor area to be used for commercial or accessory purposes; (c) a two percent or smaller change in the number of parking or loading spaces; and (d) the relocation of a build-

ing within five feet of its approved location). The Chief of the Zoning Regulations Division of the Consumer and Regulatory Affairs Department may approve minor modifications. *Id.*

9. *See id.* § 2407.9, as amended, 40 D.C.Reg. 3741 (1993).

10. *Id.* §§ 2405.9 (first-stage approval), 2406.3 (second-stage compliance with first-stage approval), 2406.6 (final second-stage approval).

11. *See id.* § 2400.7(c) (amenities and public benefits provided by all PUDs must be superior to those required under matter-of-right zoning).

A.2d at 556; *see also Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (agency's interpretation of statute controls unless arbitrary, capricious, or manifestly contrary to law); D.C.Code §§ 5–412 to 414 (Repl.1988). Thereafter, the only question is whether the Commission's findings that Phase III is consistent with Phase I are arbitrary, capricious, or not supported by substantial evidence in the record. *See Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n, supra* note 7, 355 A.2d at 560.[12]

We therefore reject petitioner's argument that the IMF was required by the zoning regulations for PUDs and PUD modifications to meet a special burden of proof for the Phase III modification. In Phase I the Commission approved the underlying PUD proposal for development of the full square, and in Phase II it granted the modification in accordance with the original purposes of the PUD application. The Phase II order also provided that the IMF could return to the Commission if it acquired the church property.[13] Thus, the Phase II order made clear that the Commission's determination of the amenities and public benefits required to compensate for the increased density of the Phase II modifications was not binding should the IMF subsequently acquire the church property. Hence, when the IMF acquired the church property in Lot 826, the IMF could, with the Commission's approval, proceed with the original plan for Square 120 approved by the Commission in Phase I. Further, because the evidence before the Commission showed that ten years after approval of Phase II, the IMF's membership

and personnel had increased, the IMF could seek adjustments to meet its present needs.[14]

Unlike *Gray v. Trustees, Monclova Township*, 38 Ohio St.2d 310, 67 O.O.2d 365, 313 N.E.2d 366, 370 (1974), on which petitioner relies, Phase III did not involve a change in the primary use of the property that the Commission had approved in Phase I. The IMF had always intended to include the entire square within the PUD development, as reflected in its original PUD application and the Commission's Phase I order. There is nothing in the zoning regulations to prevent the Commission from reexamining Phase II trade-offs in light of the IMF's acquisition of the church property as originally anticipated in Phase I, or from concluding that the IMF's original plan could now be accomplished, albeit with some adjustments to accommodate present needs. *See Aquino v. Tobriner*, 112 U.S.App.D.C. 13, 16, 298 F.2d 674, 677 (1961) (no vested right in zoning classifications); *see also Scholtz Partnership v. District of Columbia Rental Accommodations Comm'n*, 427 A.2d 905, 918 (D.C.1981) ("[a] vested right must be more than a mere expectation based on the anticipated application of existing law").

Furthermore, while the record of the Phase II proceeding makes clear, as petitioner maintains, that the Commission was sensitive to the implications of added density, the Phase III order reflects a balance of interests. *See Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n, supra*, 426 A.2d at 336. The Commission required the IMF to provide amenities and public benefits in excess of what would be required under matter-of-right zoning. This is clear from the nature of the design, the exterior materials to be used, the elaborate landscap-

12. In light of our other conclusions, we do not address the IMF's contention that a PUD amendment is like a zoning map change and, therefore, requires no showing of mistake or substantial change in the area for modification. *See Citizens Ass'n of Georgetown v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 39 (D.C.1979) (map amendments do not require special showing). *See also Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n, supra*, 426 A.2d at 332 (PUD is part of larger zoning scheme).

13. Condition 15 of the Phase II order provided that:

[i]f and when the [IMF] shall purchase[,] lease or otherwise gain effective control over the use of Lot 826 in Square 120 now owned by the Western Presbyterian Church, no use of the property by the IMF shall be established without prior approval of the Zoning Commission.

14. Contrary to petitioner's contention, the IMF's representation in its 1980 Phase II application and commitment at the Phase II hearing to house new employees at another site was limited to a ten-year period.

ing plan, and the expansion of the Visitors' Center at ground level. The balance is also evident from the Commission's acknowledgement of the significance to the District of Columbia of the presence of the IMF as an international center and the fact that the somewhat unique working space requirements of the IMF justified consolidation of its employees in a single building with a superior working environment at the present site. Significantly as well, there was evidence before the Commission that the increased density in the Phase III modification was fairly comparable to 7.0 FAR in normal commercial occupancy. *See infra* Part III A.

■ Consequently, if there is a deficiency in the Commission's order, it stems from the absence of an express comparison of the Phase II and Phase III amenities and public benefits. The Commission declined to analyze the dollar figures attributed by opponents to the increase in FAR as compared to the value of the proposed Phase III amenities and public benefits. It also declined to adopt the view of the Office of Planning that "a true net gain" in amenities and public benefits should be required in return for the increased density. In view of the nature of petitioner's objections to elimination of the mini-park and the increased density, the Commission's order undoubtedly would have benefitted from a comparison of the amenities and public benefits in Phase II and Phase III, thereby explicitly reaffirming that the PUD process cannot be used to circumvent zoning requirements. *See Blagden Alley Ass'n v. District of Columbia Zoning Comm'n, supra,* 590 A.2d at 144–45 (court "wary of the effect of a policy that relaxes zoning restrictions while according, without some articulated standards, benefits elsewhere"). Nevertheless, we conclude that it is implicit in the Commission's findings that Phase III's proposed building design and materials, landscaping, and expanded Visitors' Center, when combined with the superior working space and the importance of the IMF's location at the present site in the District of Columbia, provided adequate amenities and public benefits. *See Dupont Circle Citizens Ass'n v. District of Columbia*

*Zoning Comm'n, supra,* 426 A.2d at 332 (acknowledging deference to Commission expertise).

Accordingly, we find unpersuasive petitioner's contention that the Phase III order of the Commission cannot withstand scrutiny in light of the balance struck by the Commission in its Phase II order. In response to changed conditions—acquisition of the church property in Square 120 and the growth in membership and personnel of the IMF ten years after the Phase II approval—the Commission, guided by the Phase I order approving development of the entire square, could reexamine the Phase II trade-offs and conclude, provided its findings are supported by substantial evidence, that the IMF had met its burden for approval of the Phase III modification.

### III.

Thus, the question is whether there was substantial evidence to support the Zoning Commission's key findings, namely that (1) the approved increase in FAR was a function of the original PUD and within the envelope originally approved in Phase I in 1969; (2) the mini-park and church restoration public benefits of Phase II did not indicate that further development would not be approved but were interim in nature; (3) the amenities and public benefits in Phase III sufficiently compensated for the increase in density of the proposed addition; and (4) the IMF's Phase III proposal complies with the District of Columbia Comprehensive Plan of 1984.[15]

■ Upon review of an order of the Commission, the court does not reassess the merits of the decision, but rather must determine whether findings supporting the decision are "arbitrary, capricious or an abuse of discretion, not supported by substantial evidence." *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n, supra* note 7, 355 A.2d at 560. The court must determine whether the Commission made a finding of fact for each material contested issue of fact, whether substantial evidence supports each finding, and whether a conclusion legally sufficient to support the decision flows rationally

15. *See* 10 DCMR §§ 100 to 1100 (1989).

from the findings. *Levy v. District of Columbia Bd. of Zoning Adjustment,* 570 A.2d 739, 746 (D.C.1990); *Citizens Ass'n of Georgetown v. District of Columbia Zoning Comm'n, supra* note 12, 402 A.2d at 41. Substantial evidence is "more than a mere scintilla," or "such relevant evidence as reasonable minds might accept as adequate to support the conclusion." *Kopff v. District of Columbia Alcoholic Beverage Control Bd.,* 381 A.2d 1372, 1387 (D.C.1977) (citing *Vestry of Grace Parish v. District of Columbia Alcoholic Beverage Control Bd.,* 366 A.2d 1110, 1112 (D.C.1976)); *see also Bakers Local Union No. 118 v. District of Columbia Bd. of Zoning Adjustment,* 437 A.2d 176, 178–79 (D.C.1981); *Citizens Ass'n of Georgetown v. District of Columbia Zoning Comm'n, supra* note 12, 402 A.2d at 47 (agency not required to explain why it favored one witness or one statistic over another).

### A.

■ *Increased density.* The Phase III application called for an increase in the overall FAR from 7.676 to 9.07 as a result of the 10.11 FAR of the proposed addition to the expanded building. Petitioner points out that Phase II was approved with a 7.0 FAR and that the Phase II modification allowed the moderate increase to 7.676 to compensate for the fact that the IMF was unable to purchase the property owned by the church, which it has since acquired. In approving Phase III, the Commission found that:

> [t]he FAR increase to 9.07 is a function of the original approval of the development of the square, the approved height of 130 feet, and the footprint. The FAR is within the envelope originally approved when the development plan for the square was approved in 1969. With regard to the increase above the level approved in Phase II, the Commission finds that the applicant adequately explained the justification for the increase, including the nature of the use and the atria, translation and international communication needs, and other unique space utilization. The Commission further finds that the designation of high density commercial, and the surrounding development would have justified a request for rezoning to C–4, which would permit a 10.0 FAR as a matter-of-right.... [16]

These findings are supported by substantial evidence in the record, and the Commission's conclusion that the increased density was warranted flows rationally from these findings.[17] *See Levy v. District of Columbia Bd. of Zoning Adjustment, supra,* 570 A.2d at 746.

At the Phase III hearing, the Director of Administration of the IMF explained that the IMF had requested permission to build an addition to its building because of an increase in staff size after ten years. He testified that 400 staff members and facilities were being housed in a leased building several blocks away, which was inconvenient, costly, and inefficient. The Administrator stated that it would not be feasible for the entire IMF to move for two reasons. First, the present site is located directly across the street from the World Bank, with which the IMF interacts extensively. Second, the present building has special characteristics that suit the IMF's needs in a way that a standard commercial building would not, such as the building's symbolic role as IMF headquarters, its international activities, and the space provided for conferences, translation facilities, international communications facilities, a large travel office, the library, and the teaching institute.

A design planner testified that the large amount of open space in the building, in comparison to the relatively small number of employees, creates, in effect, a lower FAR more akin to that of a "typical" commercial office building with an FAR of 7.0. He pointed out that much of the square footage included in the 9.07 FAR includes support and ancillary spaces, which do not house as

---

16. Under commonly understood zoning terms, "footprint" refers to the land covered by the development, and "envelope" refers to the set of limitations within which a development must be designed and built. *See The American Heritage Dictionary* (3d ed. 1992).

17. Petitioner does not contend that the Commission erred in finding that the IMF could not have obtained C–4 zoning.

many employees as most buildings with the same square footage. A witness from the Office of Planning agreed, testifying that in calculating the FAR by according a "generous" 250 square feet to each employee, the FAR achieved was 4.9.

A landscape architect also testified that the increase in density was due in part to the fact that under the Phase III proposal the atrium would be reduced to a "partial" atrium (in terms of its depth from the roof down into the building) in order to accommodate the full floorplates necessary in the construction of the support and ancillary spaces (such as library and training rooms).[18] In Phase I and Phase II there was a full atrium, which was included in the FAR calculations, resulting in lower density. He also explained that part of the increase in FAR resulted from the effort to maintain the same height and theme of the first two phases.[19]

Similar testimony was presented by the Office of Planning, to the effect that important factors in its conditional approval of the Phase III application were that it was within PUD regulatory height guidelines (130 feet in a C–3–C zone) and that the bulk was compatible with the existing bulk because of the "major interactive streetscape element." The Office of Planning concurred in the view that the high FAR was caused by adherence to the lines set out by the first two phases. While the planning expert in opposition suggested the irony of this position—that Phase II density justified increased density in Phase III in order to avoid urban design problems—the Zoning Commission was free to reject this view in light of the original plan to develop the entire square and the IMF's acquisition of the church property at a time when the IMF's membership and personnel had increased. See Citizens Ass'n of Georgetown v. District of Columbia Zoning Comm'n, supra note 12, 402 A.2d at 47 (affirmance where substantial evidence supports basic facts and leads to rational conclusion by

agency); Levy v. District of Columbia Bd. of Zoning Adjustment, supra, 570 A.2d at 746.

The Commission found that:

[t]he increased density in Phase III is a result of the atrium being only a partial atrium in height. In order to accommodate additional demands for support and ancillary space, full floor plates were necessary. The typical office floor, consisting of private offices and support areas to those offices located around the internal atrium and exterior wall, provides as much light and air as possible, consistent with Phase I and II.

The evidence before the Commission provides an adequate basis for this finding and leads logically to the Commission's conclusion that the increase in FAR is a function of the previously approved Phase I building and is within the existing bulk envelope in light of the Phase II development. In other words, consistent with Phase I, the more intensive use of the space permitted the IMF's special needs to be met in accord with the exceptional working environment in Phase II.

**B.**

Elimination of Phase II amenities. As part of the amenities package justifying approval of the Phase II modification, the Commission required the IMF to pay for the refinishing of a brick portion of the church in stone to match the rest of its existing facade and for the repair of a portion of the brick wall surrounding the church. The Commission also required the IMF to construct a proposed mini-park and to record a covenant binding the use of the property in accordance with the order "or amendments thereof by the Zoning Commission."

In the Phase III order, the Commission acknowledged petitioner's contention that the mini-park and church restoration evidenced an intent that no further development of the property would take place. But, the Commission found that:

---

18. Floorplates are plates of iron or steel set in or forming part of a floor or supporting the studs of a wall. See Webster's Third New International Dictionary (1986).

19. The architect also suggested that at the time the 7.0 FAR of Phase I was calculated, such calculations did not always include support space and therefore the original FAR including support space might have been higher than it appeared.

[t]hese assertions are flatly contradicted by Condition No. 15 in Z.C. Order No. 310 which directs the IMF to return to the Zoning Commission if and when it gained control of Lot 826. The Commission finds that these amenities offered as part of the Phase II approval were viewed as interim in nature ....

Based on both Condition 15, *see supra* note 13, and the language directing that a covenant be recorded binding the use of the property in accordance with the order *or* with its amendments, there was substantial evidence to support the Commission's finding that the mini-park and church restoration were not contemplated as existing in perpetuity.[20] The Commission's determination was a logical conclusion based on substantial evidence.

### C.

◼ *Phase III amenities and public benefits.* During the Phase III hearing, the Commission Chairperson identified two public benefits offered by the IMF to justify the proposed building expansion: the landscaping replacing the mini-park and the expansion of the Visitors' Center at ground level. A review of the record demonstrates that there was substantial evidence before the Commission to support its findings and conclusion that the Phase III modification provides adequate amenities and public benefits to compensate for the building expansion.[21]

The IMF's landscaping architect testified that the proposed landscaping would provide an "interactive public open space" by breaking the visual and physical barriers to pedestrian access onto the property and erecting wide walkways, seating areas, and a series of mini-gardens. During cross-examination, he addressed the loss of the open space sur-

rounding the church by stating that the new landscaping design would provide an "entire pedestrian environment" using the IMF building as a "backdrop" to the open spaces provided. There was also testimony from the Office of Planning about the "exceptional" landscaping and the more accessible Visitors' Center, as among the public benefits offered by the IMF. The Office of Planning listed as additional amenities the "superior working environment" of the proposed building expansion and the contribution of the site to the District of Columbia's role as an international center.

The Commission's findings reflected the landscape architect's testimony, outlining the "interactive public open space" and contrasting the proposed landscaping with the existing mini-park, "which involves a minimal street-tree planting system, a four-sided walkway system and minimal planting." The Commission also noted that the proposed landscaping, "which includes public space as well as IMF property," would provide approximately 65,000 square feet of space, as opposed to the existing mini-park's 6,751 square feet, and described the positive public aspects of the proposed landscaping design. While noting the "negative amenities" arising from the rezoning of the church property and the elimination of the mini-park, the Commission concluded that:

the applicant has met its burden of proof. In order for the Commission to approve the increase in density above PUD guidelines, the applicant had to meet its burden of demonstrating the public benefits and other meritorious aspects of the proposal. Those benefits, as outlined by the applicant, include the superior architectural design, the interactive landscaped area, the Visitors' Center (which will triple in size),

20. While petitioner argues that Condition 15 must be read in the context of the Phase II hearing, the terms of the Commission's Phase II order, particularly Condition 15, indicate that the Commission did not adopt all of the views expressed during the hearing. Condition 15 also effectively disposes of petitioner's contention that if the mini-park were interim in nature, the Phase II approval would have been "illegal" because without the mini-park as a public benefit there would have been no basis for granting the additional density in Phase II.

21. While the Chairperson suggested that there be negotiations between the IMF and community representatives to expand the offered public benefits, he also recognized the adequacy of the benefits already proposed, pointing out that his suggestion "is not to criticize what has been done. It is simply to indicate that there, again, is an area where there may be some movement."

the transportation management program and the overall indirect benefits to the District resulting from the presence of this prominent international organization.[22]

Contrary to petitioner's contention, the Commission was not required to find that the IMF would provide a net increase in amenities and public benefits in Phase III over Phase II. *See supra* Part II. The Commission found that the Phase III proposal includes superior architectural design, "interactive landscaping," and an expanded Visitors' Center, in addition to maintaining the IMF at its present site, thereby benefiting the District of Columbia as a whole. Upon considering the public benefits in the context of the nature of the IMF and its role, the Commission could reasonably conclude that the Phase III public benefits are a sufficient trade-off to the increased density of the expanded building.

## D.

■ *Comprehensive Plan.* The Commission could also properly find that the Phase III modification complies with the Comprehensive Plan.[23] Petitioner points to the rezoning of the church property, the single purpose of the proposed building, general design aesthetics, and the relocation of the homeless feeding program as evidence that the PUD is inconsistent with the Comprehensive Plan. We conclude that petitioner's contentions are unavailing in view of the Comprehensive Plan's policies to build upon the District's role as the nation's capital and the economic center of the national capital region, the "high priority" placed on expanding the District's role as a leading center for international business,[24] and the high-density designation of the IMF square in the Comprehensive Plan.

Petitioner particularly focuses on the Comprehensive Plan's purpose to "protect residential neighborhoods from disruptive uses" and commercial encroachment by "strict application and enforcement" of zoning codes.[25] Based on the evidence, the Commission could conclude that rezoning Lot 826, which the church had previously owned, is not incompatible with the objectives of the Comprehensive Plan to protect residential neighborhoods. The area surrounding Lot 826 is zoned for commercial use, and, as the Office of Planning observed, "the immediately surrounding site is characterized by substantial institutional, international finance and commercial uses."[26] Only Lot 826 remains zoned residential. Hence, the rezoning at issue is not occurring in an area properly characterized as a "residential neighborhood."[27]

There was also substantial evidence to support the Commission's finding that Phase III is not contrary to the commercial land use objectives of the Comprehensive Plan.[28] Al-

22. In its Phase III application, the IMF proposed to continue the existing transportation management program, with parking priority given to car pools, active promotion of Metrorail and Metrobus use, ride-matching for car and van pools, and coordination with the World Bank. *See* 11 DCMR §§ 2403.15, 2404.11(f) (1991) (transportation management requirements).

23. *See* 10 DCMR §§ 100 to 1100 (1989) (Comprehensive Plan); *Tenley & Cleveland Park Emergency Comm. v. District of Columbia Bd. of Zoning Adjustment*, 550 A.2d 331, 337 (D.C.1988), *cert. denied*, 489 U.S. 1082, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989) (purpose of Comprehensive Plan). *See also* 11 DCMR § 2400.5 (1991) (PUDs must comply with Comprehensive Plan).

24. 10 DCMR §§ 200.2, 202.10 (1989).

25. *Id.* §§ 1102.1(e), (f), 1104.1(b).

26. The area to the east of the IMF is zoned C–4, which allows high-density residential and mixed-

use developments, including commercial, retail, and business uses. *See* 11 DCMR, §§ 750.2, 750.3 (1991). To the west lies George Washington University, and to the north is Pennsylvania Avenue.

27. Petitioner's reliance on the Ward 2 policies of the Comprehensive Plan is misplaced. The Ward 2 element describes the ward as a series of concentric rings, with the second ring designated as the central employment area, which includes the IMF site in Square 120, and the third ring consisting primarily of residential neighborhoods. 10 DCMR § 1200.225(a)–(e), as amended, 37 D.C.Reg. 172–73 (1990). Therefore, Ward 2 plan's objective of protecting residential neighborhoods is not contrary to the rezoning of Lot 826, which was formerly owned by the church.

28. *See id.* § 109.1, as amended, 37 D.C.Reg. 56 (1990) (land use element of Comprehensive Plan given greater weight than other elements).

though the Comprehensive Plan directs high-density commercial areas to include a mix of business and retail uses, it does not require the PUD itself to contain a mix of business and retail uses.[29] Instead, the Commission must ensure that the entire area, taken together with the IMF property, follows the objectives of high-density zoning.[30] In approving the Phase III application, the Commission noted the objections of the ANC–2A to the "single-use building." However, it also noted that the area surrounding the IMF PUD site has been designated high-density commercial and referenced the "federal element" of the Comprehensive Plan, which directs the encouragement of existing international organizations in their present locations and in proximity to other international institutions. Based upon the character of the site and surrounding area, as well as the nature of the IMF's functions, the Commission could reasonably conclude that Phase III did not conflict with the land use policies of the Comprehensive Plan.

In addition, the Commission could conclude that Phase III is not contrary to the urban design objectives of the Comprehensive Plan because of the replacement of a low-scale building and mini-park with a 130 foot thirteen-floor building.[31] The landscape architect testified about the building design,

commenting on the proposed "water garden" and presenting drawings designed to demonstrate the building's compatibility with the surrounding area. He also described the pedestrian walkways and tree plantings in the Phase III proposal. The Office of Planning stated in its report that the addition would "fit in contextually with the surrounding buildings." The Commission's findings addressed the appearance of the building and could reasonably lead to the Commission's conclusion that the Phase III PUD, located in the District's financial center, does not conflict with the Comprehensive Plan.

## IV.

Finally, petitioner contends that the Commission erred in ruling that the issue of the impact of the relocation of the church and its associated homeless feeding program to another site was not properly before the Commission in the Phase III proceeding.[32] See D.C.Code § 1–261(d) (1992). We disagree.

At the hearing, the IMF argued that the relocation of the church was not directly tied to the proposed Phase III expansion.[33] The opponents took a different view.[34] ANC–2A, as well as petitioner and the Office of Planning, expressed concern regarding the im-

**29.** See id. §§ 1106.3, 1106.4. The report of the National Capital Planning Commission stated that because of potential problems of security, insurance liability, administration, and contractual concerns, the State Department was reluctant to provide areas for mixed use activities in the IMF building.

**30.** See 11 DCMR § 2400.1 (1991).

**31.** See 10 DCMR § 700.4 (1989) ("[f]uture development must be carefully controlled to protect and enhance the neighborhoods, natural open spaces, and national and international image qualities [of the District]"); id. §§ 701.1, 701.2 (to achieve the Plan's goal to "enhance[] the District's aesthetic qualities [and] emphasize neighborhood identities," buildings are to "complement or enhance the physical character of the District" and to "include the use of appropriate arrangements of building materials, height, scale, massing, and buffering to complement the immediate region").

**32.** Petitioner also contends that the Commission failed to address the ANC's concerns regarding

noncompliance with the Comprehensive Plan, as well as "other issues." As discussed in Part III, supra, the Commission's findings regarding the issues raised by petitioner on appeal are based upon substantial evidence and are not unreasonable, and, thus, adequately address these concerns of the ANC.

**33.** The IMF architect testified that the title to the church property had passed to the IMF and full payment had been made, notwithstanding other contingencies. He testified that the church had decided to move in any event.

**34.** A planning consultant appearing as an opposing witness took issue with the IMF's position that there was no nexus between Phase III approval and the relocation of the church, testifying that (1) the IMF could not build the addition if the church remained on site; (2) the church's move is conditional upon Phase III being approved; (3) the Office of Planning, recognizing that there were legitimate concerns about relocation of the church's program, viewed the amenities as insufficient and therefore proposed that there be a replacement feeding program either in the IMF facility or a church in the same area.

**590**

pact of relocating the church, and, more specifically, the homeless feeding program, to a residential neighborhood. The Commission took note of the concern, and, while concluding that the issue was not before it, nevertheless noted the church's assurances of its intent to ensure that the feeding program did not adversely affect neighborhood safety.

It is undisputed that the church was not a party to the Phase III proceeding and that the church's relocation was not being offered by the IMF as a public benefit in support of the Phase III modification. Moreover, notwithstanding its comments about "a true net increase" in benefits, the Office of Planning acknowledged in its report that the connection between Phase III approval and the church's feeding program was "tenuous." Because the church was not an applicant before the Commission and its relocation was not offered as a public benefit in support of Phase III, we are satisfied that the Commission could properly decline to address the issue of the impact of the church's feeding program at the new site. *See Bakers Local Union No. 118 v. District of Columbia Bd. of Zoning Adjustment, supra,* 437 A.2d at 179 (Commission must address only those concerns of the ANC that are "legally relevant") (citing *Wheeler v. District of Columbia Bd. of Zoning Adjustment,* 395 A.2d 85, 91 n. 10 (D.C.1978)). On this record it is difficult to understand how the IMF or the Commission could control the activities at a different location of the former owner of Lot 826.[35] Even petitioner pointed out that the church would not be able to operate its feeding program at the new location without obtaining a special exception from the Board of Zoning Adjustment. To this extent, the Commission was not the proper entity to address the concern of petitioner and ANC–2A about the impact of the feeding program at the new location. Therefore, the Commission would reasonably conclude that issues related to the church's

operations at a different site were collateral and not germane to the Phase III application.

 Accordingly, we affirm the Commission order.[36]

---

**35.** *Blagden Alley Ass'n v. District of Columbia Zoning Comm'n, supra,* 590 A.2d at 148 (off-site public benefits), is not to the contrary. The IMF did not claim that the church was in any respect an amenity or public benefit offered for approval of Phase III.

**36.** We find no error by the Commission in denying petitioner's motion for reconsideration, which asserted that the Commission lacked juris-

diction on the basis of the Foreign Missions Act, 22 U.S.C. §§ 4301–4316 (1990); D.C.Code §§ 5–1201 to –1215 (1988 & Supp.1993). The record is uncontradicted that the Secretary of State had not exercised his discretion to treat international organizations as "foreign missions." *See* 22 U.S.C. § 4309(b) (1990); D.C.Code § 5–1209 (1988).