**DISTRICT CONCRETE COMPANY,
INC., Appellant,**

v.

**BERNSTEIN CONCRETE
CORPORATION,**
Appellee.

No. 13380.

District of Columbia Court of Appeals.

Argued Jan. 16, 1979.

Decided Aug. 7, 1980.

Rodney F. Page and Paul A. Kaplan, Washington, D. C., for appellant.

Daly D. E. Temchine, Washington, D. C., for appellee.

Before KERN and MACK, Associate Judges, and WEBBER, Associate Judge, Superior Court of the District of Columbia.*

MACK, Associate Judge:

Bernstein Concrete Corporation (Bernstein) successfully sued its concrete supplier, District Concrete Company, Inc. (District) for breaches of contract and warranty arising from the delivery and use of defective concrete. In this appeal, District submits that Bernstein did not present sufficient evidence on causation to hold District liable. It further challenges the correctness of the damages award on several grounds, arguing that an incorrect measure of damages was used, and alternatively that the damages were neither foreseeable nor reasonable. After a thorough review of this extensive record, we affirm.

I

■ Savoy Construction Company, Inc. (Savoy),[1] the general contractor for the construction of the Capitol View Plaza II apartment building project (Project), subcontracted with Bernstein to perform the concrete work on the Project. Pursuant to this subcontract, Bernstein entered into a requirements contract with District for the needed concrete.[2] The contract called for, *inter alia*, concrete that would have a compressive strength of 3000 pounds per square inch (psi) or "a 6 bag mix."[3] This particular mix was to be used for pouring the roof of the Project, on which would rest the mechanical facilities for the building. In addition, the roof itself was a cantilever design which required this strength concrete to support itself. The contract with District expressly incorporated the specifications of the Project. District expressly warranted the concrete it supplied. Bernstein, under its contract with Savoy, was responsible for conducting tests on the poured concrete to insure conformance with specifications.[4]

According to industry custom and practice, a concrete contractor assumes responsibility for the material when it is actually discharged from the truck. Until this

---

* Sitting by designation pursuant to D.C.Code 1973, § 11–707(a).

1. Savoy and Bernstein were separate and independent corporations under the common ownership of Saul H. Bernstein, sharing accounting and payroll staffs. They have since merged.

2. The contract is governed by Article 2 of the Uniform Commercial Code (U.C.C.) codified at D.C.Code 1973, §§ 28:2–101 *et seq.*; *Bevard v. Howat Concrete Co., Inc.*, 140 U.S.App.D.C. 96, 433 F.2d 1202 (1970).

3. A "mix design" specifies the proportional relationship (per cubic yard) of the various components of concrete, *i. e.* sand, gravel, cement, and water. Concrete is not created until all these substances have been combined and mixed.

4. Concrete strength cannot fully be determined until it has hardened. A "slump" test is taken at the site to grossly measure the water content. In addition, when the material is poured from the trucks, two cylinder samples of the batch are taken. One is tested after 7 days, the second after 28 days. If the 7–day test is significantly below design, more specific and precise testing can commence pending the outcome of the 28–day test. If the required strength is not achieved by the 28th day, the concrete is deemed defective.

point, the supplier maintains responsibility and control. An industry standard specifies a maximum 90–minute waiting period once the dry ingredients are mixed (in this case when the truck leaves the District plant), after which the concrete may be too "old" to develop its designed strength. Under the instant contract, District was to dispatch its trucks to the construction site with the appropriate mix of materials, absent water. At the site the driver was to add the requisite amount of water and mix the batch before unloading it.

On October 29, 1974, the building roof was poured. Sometime during the day defective concrete found its way to the roof. The 7–day tests revealed the possibility, later confirmed, of concrete substantially below design strength distributed over a rather wide area of the roof. District was informed of the preliminary results. Extensive testing was then conducted to identify the magnitude of the defect, and the extent of the roof area involved.

Upon discovery of the defective concrete, further work on the project halted, pending correction of the problem. Bernstein initially considered three possible approaches to cure the problem, ultimately narrowed to two: (1) tearing out the 5,000 square feet of defective concrete and replacing it, or (2) construction of a "composite slab" over the defective area.[5] A larger area was designated for replacement than originally estimated because of the structurally critical importance of this area of the roof. District was informed that these two methods were under consideration.

At the time it weighed the merits of these alternatives, Bernstein estimated the cost of each to be approximately $100,000. It anticipated the tear–out method would take from 4–8 weeks to complete, whereas the composite slab method would take 5–6 weeks. Other considerations were factored into the decision, among them: possible damage to Bernstein's and Savoy's reputation and possible economic loss by undertaking the highly visible tear–out method;[6] the potential for additional structural damage caused by jackhammering used in the tear–out method which would necessitate, at a minimum, retesting equipment already in place (the affected roof area was near the elevator shaft and electrical conduits); additional safety problems inherent in the tear–out method, created in part by the cantilever overhang design.

Saul Bernstein, President of both Bernstein and Savoy, made the decision to proceed with the composite slab method. At the time he thought the costs and delays associated with this method could be more reliably anticipated. Subsequent events proved him wrong; the repairs took 6 months to complete at a cost of $222,681.57. The Project architect expressed a preference for the tear–out method, but designed and approved the composite slab alternative. He advised Bernstein that he thought this method would be more costly in the long run. There was testimony that the tear–out method is generally used, although it is not the preferred method of contractors. District was aware of the choice of the composite slab remedy and did not at the time object.

The length of time to make the repairs was the greatest factor contributing to their unanticipated cost. The bulk of the delay was due to an unforeseen shortage of the necessary steel. Bernstein had contacted a local supplier before the final selection of a repair method and was told it was available. This 6–week delay, coupled with design delays, postponed commencement of the repair work for several months. There was conflicting testimony as to how many

---

5. A "composite slab" is composed of a steel frame over which a tin form is built, and concrete poured. Its purpose is to transfer all pressure away from the defective area, and replace its structural function.

6. There was testimony about the adverse impact on the local industry caused by the 1973 collapse of a building under construction at Bailey's Crossroads, Virginia. Because part of Savoy's compensation was keyed to receipts when the building was 95% occupied, the confidence of the community in the structural integrity of the building was a major consideration, according to Mr. Bernstein.

of these costs would have been avoided had the tear–out method been used. Since that alternative was rejected after preliminary estimates, no further costs details were developed. Those delays due to testing (2 months) and some delay caused by redesign and actual repair were unavoidable regardless of the method selected.

The parties stipulated that Bernstein incurred actual costs of $222,681.57 in making these repairs. The amount includes: $8,439.36 for the testing; $115,215.23 to have the work actually performed; $14,366.68 in related costs including delay costs to subcontractors, modifications to the boiler room equipment, storage charges and the like; $84,660 for additional field overhead expenses incurred by Bernstein and Savoy as a result of the delay in completing their performance of the Project.[7]

A 3–day bench trial was held. On the issue of District's liability for the damage, Bernstein's evidence showed that all the concrete on the day in question was supplied by District; that the concrete varied significantly from the design mix, having only 2.74 bags of cement and a high water–to–cement ratio. In addition Bernstein proffered that it gave no orders to the District drivers to add unusual amounts of water; that despite some delays due to a crane breakdown, there was no evidence that concrete older than 90 minutes was used.

In denying liability, District presented evidence showing no abnormality in its automated batching process that could account for any defect. It argued that if the concrete were as watery as Bernstein claimed, its faulty condition must have been visible to Bernstein when it accepted the load, making Bernstein responsible for the consequences; that according to its estimates based on reconstructed records, a number of trucks were required to wait beyond the

90–minute point before discharging their loads.[8] It argued that the defective concrete could have resulted independently from the addition by Bernstein of too much water.

At the trial's conclusion the judge requested each party to submit proposed findings of fact and conclusions of law. Those submitted by Bernstein were adopted with only minor modifications. By order, the judge granted the full $222,681.57 request, set off by District's counterclaim of $56,243.77 (unpaid balance due on concrete supplied) for a net judgment of $166,437.80. In addition to adopting Bernstein's proposed findings of fact and conclusions of law, the judge specifically concluded that the concrete was defective when District delivered it; that District had breached both the express and implied warranties given to Bernstein, and the contract; that the method chosen by Bernstein to remedy the defect was reasonable under the circumstances; that the damages claimed by Bernstein were proximately caused by District's breaches which were reasonably foreseeable; that the measure of damages was the cost of remedying the defect which entitled Bernstein to consequential damages.

District challenges all aspects of the trial court's ruling. First, it submits that it was error to conclude that District was liable. It argues the evidence showed other equally plausible explanations for the defect. Moreover, even accepting Bernstein's evidence, the defect would have been obvious at the time of delivery. Second, it contends that the measure of damages used by the trial court, i. e. actual costs incurred by Bernstein, is incorrect since Bernstein substantially deviated from the original design and specifications in its corrective measures. Third, it differs with the trial court's determination that Bernstein's actions were reasonable, and that the damages were rea-

---

7. Bernstein testified that, had the defective concrete events not occurred, the bulk of this aspect of the Project would have been completed by December, 1974. Instead, this point was not reached until June, 1975.

8. This evidence was presented by District's general manager, and included a number of assumptions. There was no direct evidence that any "old" concrete was used. Moreover, there was no record of any abnormalities reported by District's drivers, despite instructions that they should be reported.

sonably foreseeable. Fourth, District argues that the trial court incorrectly included "delay" damages (field overhead) since the Project itself was completed on schedule. Finally, it asserts it was entitled to an award of interest on its counterclaim.

## II

At the outset, we are confronted with an assertion by District that the trial court's judgment in this case is to be given little weight because it adopted a party's Proposed Findings of Fact and Conclusions of Law. Much of District's appeal contests these factual conclusions of the trial judge. It urges us to dispense with the usual standard of review imposed by D.C.Code 1973, § 17–305(a).[9]

A stricter review of the record is in order when a trial judge adopts, verbatim, the proposals of one party. However, the essential inquiry on review in such a case is whether these "findings and conclusions ultimately represent the judge's own determinations." *Sullivan v. Malarkey,* D.C.App., 392 A.2d 1057, 1061 (1978). We are satisfied that this requirement is met here. The order of the trial judge makes six specific findings before adopting the proposed findings and conclusions submitted by Bernstein. Additionally, it should be noted that the judge chose not to adopt one portion of the proposal that was inconsistent with his own findings. Because we conclude that the findings and conclusions represent the judge's own determinations, the "clearly erroneous" rule applies. *In re Las Colinas, Inc.,* 426 F.2d 1005 (1st Cir. 1970), *cert. denied,* 405 U.S. 1067, 92 S.Ct. 1502, 31 L.Ed.2d 797 (1972).

## III

District's trial theory of liability is reargued here–that the evidence showed two independent causes for the defect–too little cement, or too much water. Since the evidence showed no abnormality in its concrete batching process, it argues an inference can be drawn that the defect was caused by too much water. The addition of water occurred at the site and was subject to the direction of Bernstein; therefore Bernstein's own actions could be equally responsible for the defect. The evidence shows, it submits, the equal likelihood of either cause; accordingly Bernstein failed to meet its burden of proof.

The record simply does not support this assertion. The samples revealing the presence of defective concrete were taken from District's trucks *before* unloading. Bernstein's expert adamantly stated that there was a significant deficiency in the amount of cement, as well as too much water. Either condition is enough to constitute a breach of express warranty. Moreover, District did not produce any of its drivers to support its theory that Bernstein instructed them to add too much water.

District also contends that the amount of water necessary to create the resulting conditions would make the concrete, at delivery, visibly defective. Consequently, by acceptance and use of the product, Bernstein assumed responsibility for the ensuing damages.

Again, the record does not support this construction. Both parties, who each had employees participating in the concrete unloading, through discovery would have located witnesses to this condition, had it occurred. There was no evidence that any visibly defective concrete was poured that day. Two of Bernstein's expert witnesses testified that the deficiency in cement and water would not be visible. A defense witness testified otherwise. We will not disturb the trial court's resolution of this factual matter in Bernstein's favor.[10] The evidence supports the conclusion that District

---

9. *D.C.Code 1973, § 17–305(a) provides in part:*
When the case was tried without a jury, . . the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it.

10. We also reject District's argument that the defect was caused by Bernstein's use of "old" concrete. The direct evidence on this point was to the contrary. Moreover, District's calculations are not credible. *See* note 8, *supra.*

is liable under alternative theories of breach of contract and breach of implied and express warranties. *Bevard v. Howat Concrete Co., Inc.,* 140 U.S.App.D.C. 96, 433 F.2d 1202 (1970); U.C.C. §§ 2–313, –314,[11] –315.

## IV

A. We turn to the issue of damages. District submits that the court used the incorrect measure of damages. The basis of this argument is the assertion that Bernstein's method of correcting the defect was a substantial deviation from the original design and specifications of the Project. District claims that the composite slab replacement was entirely different from the flat slab design; that the only proper remedy which would conform to the Project specifications was the tear–out/replacement remedy.

The underlying thesis of the cases District cites in support of this argument is that the nonbreaching party cannot receive more, through the selection of a remedy, than was bargained for.[12] The flaw in District's argument is that, in this case, the desired end product (of which all parties were aware) was a roof of sufficient strength to support the necessary equipment. Once the defective concrete was in place, a situation arose for which there were no design specifications–repair of an in–place, defective roof. The immediate objective became the selection of a remedy that would meet the ultimate requirements at the lowest cost and with the least delay. At the completion of the construction of the composite slab, a useable roof, and no more, existed. There was nothing inherently more or less desirable in the composite slab as a roof. It satisfied the requirement of being a reasonable replacement.

In addition, the contract between Bernstein and District contained no clause designating a remedy. However, the specifications for the Project, which were incorporated by reference into the District contract, provided for use of the tear–out remedy. District incorrectly argues that it was thus entitled to rely on the tear–out remedy as the only remedy contemplated by the parties. U.C.C. § 2–719(1) provides that even if a remedy is specified in the contract, it is optional unless the agreement expressly makes it exclusive. Nowhere in District's contract does there appear a designation of tear–out as an exclusive remedy. The U.C.C. provision governs here. Bernstein's measure of damages was not limited to any particular remedy. Under U.C.C. § 2–714, the use of actual costs as a measure was therefore proper.[13]

11. The parties stipulated that District was a merchant of goods subject to the provisions of U.C.C. § 2–314 (codified at D.C.Code 1973, § 28:2–314).

12. *See, e. g., Meyers v. Antone,* D.C.App., 227 A.2d 56 (1967) (where plaintiff purchased real estate with warranted, used heating boiler, proper measure of damages was cost of a used, not new, boiler); *Morfessis v. Sterling Metalware Co.,* D.C.App., 193 A.2d 66 (1963) (plaintiff damage claim disallowed where he replaced, rather than repaired, damaged stainless steel panels on salad bar with more expensive formica paneling, and moved its location, necessitating plumbing expenses); *Fries, Beall & Sharp Co. v. Livingstone,* 56 App.D.C. 209, 12 F.2d 150 (1926) (plaintiff's damages for replacement of warranted roofing with more expensive and higher grade material was limited to cost of replacement of same grade and character roofing); *Delta Paving Co. v. Woolridge,* La., 209 So.2d 581 (1968) (owner's damage claim rejected in contract to perform paving work for motor freight terminal where its pav-

ing design proved unsatisfactory, requiring replacement under new design, and where owner was aware of design problems, and its actions aggravated damage; despite fact that paving subcontractor was also at fault). *But see Noel v. O'Brien,* D.C.App., 270 A.2d 350 (1970) (plaintiff's replacement of 18–year–old heating system with new heating system, where cost of repair was as much or more, upheld).

13. D.C.Code 1973, § 28:2–714 states:

(1) Where the buyer has accepted goods and given notification (subsection (3) of section 28:2–607) he may recover as damages for any non–conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would

■ B. The law is clear that a plaintiff can recover damages only for those injuries which were reasonably foreseeable by the parties, and only for reasonable actions taken by the plaintiff. *Rubewa Products Co., Inc. v. Watson's Quality Turkey Products, Inc.*, D.C.App., 242 A.2d 609 (1968); *Meyers v. Antone*, D.C.App., 227 A.2d 56 (1967); Restatement of Contracts § 330 (1932); U.C.C. § 2–714(1). District quarrels with the trial court's findings that the damages here were reasonably foreseeable, and that Bernstein's actions in selection of the composite slab method were reasonable in the circumstances.

As already noted, we will not disturb the trial court's findings unless they are clearly erroneous. District asserts that although *an* injury resulting from replacement of defective concrete was foreseeable, the particular damages resulting from selection of the composite slab were not. It contends that the usual remedy is to tear out the defective concrete; that those were the only foreseeable damages contemplated at the time of contract and in accord with the contract specifications. We think this approach is too restrictive. Foreseeability of the particular *injury* is what is contemplated by this doctrine. The reasonableness of the method of correction is a different matter going to mitigation of damages issues. In this case, District knew of the intended use. It was clearly foreseeable that if defective concrete were poured on the roof, significant structural inadequacy would result and remedial steps would have to be taken that involved some reconstruction. The record fully supports the finding that the injury here was foreseeable.

As to the reasonableness of Bernstein's actions once the defect was discovered, again the record supports the court's findings. At the time the decision was made, the costs and time involved appeared com-

parable; it was not unreasonable for Bernstein to take into consideration other less tangible consequences such as injury to reputation [14] and potential economic loss if the building did not achieve full occupancy quickly. District, although informed of the possible choice, did not express any objection. We find the reasoning of the Third Circuit persuasive in this situation. In *In re Kellett Aircraft Corp.*, 186 F.2d 197 (3d Cir. 1950) a seller who defaulted on a contract challenged the damages sought by the buyer, contending that the buyer's selection of the higher of two replacement bids was inconsistent with the duty to mitigate damages. The court stated:

> [W]hether or not the buyer's obligation to mitigate damages has been discharged depends on the reasonableness of its conduct . . . . . Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen. The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter. [*Id.* at 198–99 (footnotes omitted).]

■ The choice of the composite slab was reasonable at the time it was made. Clearly Bernstein was most concerned with minimizing costs and delays. Bernstein need not bear the burden of the unanticipated costs that were actually incurred because the selected method proved more expensive. *Accord S. J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 528 (3d Cir. 1978); *see also* D.C.C.E. § 28:2–712 Comment 2.

have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

14. District strenuously argues that it was unreasonable for Bernstein to make its decision based on "psychological" factors such as concern for its reputation. However, we do not think Bernstein needed to subject itself to these risks, when an equally viable (at the time) alternative existed.

C. District claims the inclusion of the costs of field overhead in the damages award was error. Its argument is the only valid "delay" damages would be those assessed as late penalties or liquidated damages under the general construction contract for delay in completion of the Project itself. Moreover, it asserts Bernstein estimates supporting this award, based on early completion of its responsibilities, were self-serving and speculative.

■▬▬▬▬ This misconstrues the nature of the damages claimed by Bernstein and Savoy. Saul Bernstein, President of both organizations, testified that these amounts represented actual expenditures resulting from the need to keep facilities and personnel on site for an extended period of time.[15] Had the defective concrete not been poured, they estimated completion of the major labor intensive portion of the Project by December. As it was, this status was not achieved until the following June. There is no question that the defect caused a delay and that these expenses were incurred as a result. The damage award need not be absolutely exact; a reasonable estimate based on relevant data is sufficient to support an award. *Sears, Roebuck & Co. v. Goudie*, D.C.App., 290 A.2d 826, 833, *cert. denied*, 409 U.S. 1049, 93 S.Ct. 523, 34 L.Ed.2d 501 (1972); *Guthrie v. Greenfield*, D.C.Mun.App., 109 A.2d 783 (1954). Bernstein's calculations of the cost of this delay are sufficiently detailed to support the award. These expenses are within the ambit of U.C.C. § 2–715(1) incidental damages.[16] *See also Grand Trunk Western R. Co. v. H. W. Nelson, Co., Inc.*, 116 F.2d 823, 839 (6th Cir. 1941); Restatement of Contracts § 329 (1932).[17]

## V

■▬▬ Finally, District claims it is entitled to prejudgment interest pursuant to D.C. Code 1973, § 15–108, on its counterclaim of payment for concrete delivered, since this is a liquidated debt.[18] We find this argument to be without merit. The contract itself authorized Bernstein to deduct the amount of any claim from payment due District. Even absent such a clause, U.C.C. § 2–717 would authorize Bernstein's actions.[19] The trial judge found that Bernstein was entitled to damages for breach of contract. Implicit in this finding is the conclusion that withholding payment under the contract was justified, and that Bernstein was not in breach of the contract. Accordingly, the value of the supplied concrete was not a liquidated debt "due and payable" until the contract litigation was concluded. *See Hussey Metals Division of Copper Range Co. v. Lectromelt Furnace Division, McGraw Edison Co.*, 417 F.Supp. 964 (W.D.Pa.1976), *aff'd*, 556 F.2d 566 (3d Cir. 1977).

For the reasons stated, the judgment of the trial court is

*Affirmed.*

---

**15.** Bernstein's evidence documented expenditures for Savoy and Bernstein for items such as trailer rent, heat and electricity, telephones, equipment rental, field payroll.

**16.** D.C.Code 1973, § 28:2–715(1) states:

Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

**17.** Delay damages are compensible either as part of lost profits or reimbursement for costs. *See, e. g., Whitfield Construction Co., Inc. v. Commercial Development Corp.*, 392 F.Supp. 982, 1004 (D.V.I.1975).

**18.** D.C.Code 1973, § 15–108 states:

In an action in the United States District Court for the District of Columbia or the Superior Court of the District of Columbia to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid.

**19.** D.C.Code 1973, § 28:2–717 states:

The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.