**WATERGATE EAST COMMITTEE AGAINST HOTEL CONVERSION TO CO–OP APARTMENTS, et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA ZONING COMMISSION, Respondent,**

and

**BRE/Watergate, L.L.C., et al., Intervenors.**

No. 04–AA–1056.

District of Columbia Court of Appeals.

Argued Feb. 22, 2006.
Decided July 24, 2008.

Richard B. Nettler, Washington, DC, with whom Jeannine Rustad, was on the brief, for petitioners.

Robert J. Spagnoletti, Attorney General for the District of Columbia at the time, Edward E. Schwab, Deputy Attorney General at the time, and William J. Earl, Assistant Attorney General, filed a statement in lieu of a brief, for respondent.

Paul J. Kiernan, with whom Norman M. Glasgow, Jr., Stuart W. Turner, and Mary Carolyn Brown, Washington, DC, were on the brief, for intervenor BRE/Watergate, L.L.C.

Frederic W. Schwartz, Jr., for himself as intervenor.

Before RUIZ, GLICKMAN, and FISHER, Associate Judges.

FISHER, Associate Judge:

Watergate East Committee Against Hotel Conversion to Co-op Apartments and Watergate West, Inc., have petitioned for review of an order of the District of Columbia Zoning Commission which approved a modification to the Watergate Planned Unit Development. The controversy is sparked by the plan of intervenor

BRE/Watergate, L.L.C.[1] to convert the Watergate Hotel into a cooperatively-owned apartment building.[2] The petitioners object to several of the Commission's findings and challenge certain of its procedures. Finding none of their objections persuasive, we affirm.

## I. Background

A planned unit development ("PUD") is a zoning process

> designed to facilitate the development of well-planned residential, institutional, commercial, and mixed-use developments, industrial parks, urban renewal and community development projects, or a combination of those developments and projects in any or several zoning districts.

*1330 Connecticut Ave., Inc. v. District of Columbia Zoning Comm'n,* 669 A.2d 708, 709 n. 1 (D.C.1995) (quoting 11 DCMR § 2400.1 (1994)). "[T]he PUD scheme is to be used as a tool of land use development which supports the objectives of the community by permitting the development of large areas as a unit." *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n,* 426 A.2d 327, 332 (D.C. 1981). The PUD process allows "flexibility of development and other incentives," 11 DCMR § 2400.2 (2003),[3] on the condition that "the project offers a commendable number or quality of public benefits and that it protects and advances the public health, safety, welfare, and convenience." *Id.*

The Watergate complex, located in the Foggy Bottom neighborhood of Ward 2, was one of the first PUDs to be approved (in 1962) following the adoption of PUD regulations in the District of Columbia. Since its inception the Watergate development has mixed several uses of property— apartments, commercial space, office buildings, and the Hotel. The Watergate PUD has not been static, however; it has changed several times over the years.[4] At the time of the Zoning Commission's order, it contained approximately 650 apartments, 250 hotel rooms, 500,000 square feet of office space, a significant amount of space devoted to retail sales and other

1. Although the respondent in this case is the District of Columbia Zoning Commission, it has allowed the intervenors to defend its order. There are two intervenors: BRE/Watergate, L.L.C., the former owner of the Hotel, and Frederic Schwartz, Jr., a resident of Watergate West. We have been informed by BRE/Watergate that title to the Hotel was transferred to The Residences at Watergate, Inc., after the Commission entered its final order. For convenience, we will refer to BRE/Watergate as the owner of the Hotel.

2. After this case was briefed and argued, it was widely reported in the press that, although the building is being renovated, it still will be used as a hotel. The Hotel's website reports that "we are creating the most luxurious hotel in Washington...." Watergate Hotel, http://www.thewatergatehotel.com (last visited July 10, 2008). Accordingly, the court ordered that the parties and intervenors show cause why the petition should not be dismissed as moot. We received a variety of responses and explanations, but no one has suggested that this matter is moot. BRE/Watergate represents that it "has not abandoned its plans to develop the property in accordance with the approved Zoning Commission Order, and has not changed the physical plant in a manner to preclude using the approved new program."

3. Unless otherwise noted, we will cite the 2003 edition of the regulations—those in effect when this matter was before the Commission.

4. The Zoning Commission noted four changes to the Watergate PUD—in 1968 to change the use of a building; in 1974 and 1976 to allow general office use in two different buildings; and in 1989 to accommodate an expansion of the health club. *See also Lund v. Watergate Investors Ltd. P'ship,* 728 A.2d 77, 80 & n. 4 (D.C.1999) (referring to modifications to the plan for the Watergate complex).

services, and 1,240 parking spaces. The site of the Hotel is in an SP–2 District, a zoning classification which allows apartment houses as a matter of right; absent special permission, such as that included in the approval of the Watergate PUD, offices and hotels would "now normally require approval of the Board of Zoning Adjustment as a special exception."

This case began when Monument Residential L.L.C., which had contracted to purchase the Hotel, filed an application to modify the PUD on behalf of BRE/Watergate. Among other things, the proposed modifications would convert the Hotel into 133 cooperative apartments. The application also proposed increasing the parking available to the new apartment building, making minor changes to the exterior of the building and the roof area, and modifying, but not eliminating, the health club and restaurant facilities.

The Hotel sits on Lot 807, which is owned by intervenor BRE/Watergate. The health club, restaurant, and parking spaces that serve the Hotel are all located underground on Lot 806, which is owned by Watergate East, Inc.—the owner of the building east of the Hotel. BRE/Watergate controls the underground facilities on Lot 806 (sometimes called the "Hotel Facilities Premises") through a long-term lease with Watergate East.

Neighborhood reaction to the proposed changes was mixed. Watergate West, Inc., which owns the apartment building to the west, opposed the application and is a petitioner in this case. The residents of Watergate East could not agree on whether they supported or opposed the application, so they formed two committees: the Committee of Concerned Owners of Watergate East, which supported the PUD modifications; and the Watergate East Committee Against Hotel Conversion to Co-op Apartments, which opposed the

modifications and also is a petitioner here. Watergate South, Inc., which owns a third cooperative apartment building in the PUD, and the Advisory Neighborhood Commission (ANC) also supported the application for modification.

## II. The Zoning Commission's Role

The process for approving a PUD typically is conducted in two stages. In the first stage, the Zoning Commission reviews "the site's suitability for use as a PUD; the appropriateness, character, scale, mixture of uses, and design of the uses proposed; and the compatibility of the proposed development with city-wide, ward, and area plans of the District of Columbia, and the other goals of the PUD process." 11 DCMR § 2402.2(a). "The second stage is a detailed site plan review to determine compliance with the intent and purposes of the PUD process, the first stage approval, and [the zoning regulations]." 11 DCMR § 2402.2(b). Applications for modifications to an existing PUD must "meet the requirements for and be processed as a second-stage application...." 11 DCMR § 2409.9. *See also Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n*, 639 A.2d 578, 582 (D.C.1994) (proposed modifications treated as second-stage applications).

The Commission held hearings on March 1 and 4, 2004, and on July 27, 2004, it issued findings of fact and conclusions of law approving the application. Among the Commission's conclusions of law were the following:

3. The modification of this PUD project continues to carry out the purposes of Chapter 24 of the Zoning Regulations to encourage well-planned developments that will offer a variety of building types with more attractive and efficient overall planning and design, not achievable under matter-of-right development.

4. ... [T]he change in use within the existing building will not cause any adverse effect on any nearby properties. Apartment use for this building is appropriate on this Site.... Allowing the hotel to be converted to an apartment house will not upset the mix of uses in the overall PUD. The impact of the project on the surrounding area is not unacceptable....

8. Approval of this modification to the approved PUD is not inconsistent with the Comprehensive Plan.... [5]

9. The Commission is required under D.C.Code [§ 1–309.10(d) (2001) ] to give great weight to the affected ANC's recommendation. The Commission has done so and concurs with the ANC's position that the Application should be approved.

10. The approval of the Application will promote the orderly use and development of the Site in conformity with the entirety of the District of Columbia zone plan as embodied in the Zoning Regulations and Zoning Map of the District of Columbia.

### III. Petitioners' Arguments

Petitioners raise several challenges—procedural and substantive—to the Zoning Commission's approval of the proposed modifications to the Watergate PUD. First, they contend that the Commission made a fatal procedural error by considering the application for modification even though a necessary party had failed to sign it. They also object to the Commission's nearly verbatim adoption of the applicant's proposed findings of fact and conclusions of law and to its limitations of cross-examination during the hearing. Petitioners make a broad substantive argument that the changes approved by the Commission interfere with their vested rights and amount to an unconstitutional taking of private property. They also challenge some of the findings of the Commission, including that the Hotel is not an "amenity" and that elimination of the Hotel is consistent with the District's Comprehensive Plan. Finally, they object that the Commission failed to consider the Watergate complex as a unit.

### A. Standard of Review

 "[O]ur function is not to determine whether a particular zoning action is, or is not, desirable." *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n,* 355 A.2d 550, 560 (D.C.1976); *accord, Washington Canoe Club v. District of Columbia Zoning Comm'n,* 889 A.2d 995, 998 (D.C.2005) ("We do not reassess the merits of the decision...."). Instead, "we examine: (1) whether the agency made a finding of fact on each material contested issue of fact; (2) whether substantial evidence in the record supports each finding; and (3) whether the conclusions of law follow rationally from the findings." *Cathedral Park Condo. Comm. v. District of Columbia Zoning Comm'n,* 743 A.2d 1231, 1239 (D.C.2000). "Substantial evidence is 'more than a mere scintilla[';] it is, rather,] 'such relevant evidence as reasonable minds might accept as adequate to support the conclusion.' " *Foggy Bottom,*

---

**5.** The Comprehensive Plan sets city-wide planning and development objectives. The current goals of the Comprehensive Plan are to stabilize and improve the District's neighborhoods; increase the quantity and quality of employment opportunities in the District; develop a living downtown; preserve and promote cultural and natural amenities; respect and improve the physical character of the District; preserve and ensure community input; preserve the historic character of the District; reaffirm and strengthen the District's role as the economic hub of the National Capital Region; promote enhanced public safety; and provide for diversity and overall social responsibilities. 10 DCMR § 101.1.

639 A.2d at 585 (internal citations omitted). "If there is substantial evidence to support the [Commission's] finding, then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the [Commission]." *Brown v. District of Columbia Bd. of Zoning Adjustment*, 486 A.2d 37, 52 (D.C.1984) (en banc) (quotation omitted).

■ "We will defer to the agency's interpretation of the statute and regulations it administers unless its interpretation is unreasonable or in contravention of the language or legislative history of the statute and/or regulations." *Cathedral Park*, 743 A.2d at 1239. *See also 1330 Connecticut Ave.*, 669 A.2d at 714 ("This court defers to the interpretation by the agency of its own regulations 'unless plainly erroneous or inconsistent with the regulations.'" (quoting *Smith v. District of Columbia Bd. of Zoning Adjustment*, 342 A.2d 356, 360 (D.C.1975))).

### B. Procedural Challenges

#### 1. Necessary Party

Section 2406.5 of the Zoning Commission regulations requires that "[t]he name, address, and signature of each owner of property included in the area to be developed ... shall be included in the PUD application." 11 DCMR § 2406.5. Petitioners argue that, since Watergate East, Inc., owns Lot 806 and certain changes are slated to be made to those premises (involving parking, the restaurant, and a health club), the owners of Watergate East had to sign the application for modification.[6] Because they did not do so, petitioners assert that the Commission should not have considered the application at all. For reasons explained below, we do not reach this argument.

■ Petitioners did not raise before the Zoning Commission their current protest that the Commission could not even consider the application because it did not satisfy the requirements of § 2406.5. They raised a different argument. Before the hearings began, the residents of Watergate East struggled to decide whether they would support or oppose the requested modification, and they asked the Commission to delay the hearings until they had decided what position to take. They argued that the hearings could not proceed without Watergate East because it had a property interest in the PUD as a whole and the lease for Lot 806, which it owned, prohibited use of the lot for anything but hotel support. Arguing that its voice should be heard or that its property rights would be affected is different from what petitioners now assert—that the Commission could not even consider the application without a signature from official representatives of Watergate East.

■ As a general rule,

6. The intervenor occupies Lot 806 pursuant to a long-term lease and is authorized to transfer its interest "to a transferee of the Hotel." The lease permits alterations to the leased property so long as they do not "change the general character of the Property...."

The property is now, or has been in the past, used for parking, restaurants, meeting rooms, a ballroom, a health club, and office space. Under the proposed modifications, the area will be used for parking, a restaurant, and a health club. To the extent petitioners argue that these modifications would require a change in the "general character" of the property, that is a dispute over interpretation of the lease. The Zoning Commission does not have authority to settle a contract dispute. *See* D.C.Code § 6-641.01 (2001) (setting forth the responsibilities of the Zoning Commission). Similarly, the proper interpretation of the lease is not before us at this time.

[a]dministrative and judicial efficiency require that all claims be first raised at the agency level to allow appropriate development and administrative response before judicial review. . . . Our consideration of a claim raised for the first time on appeal deprives the administrative agency of its right to consider the matter, make a ruling, and state the reasons for its action. . . . Therefore, in the absence of exceptional circumstances, we will not entertain a claim that was not raised before the agency.

*Hill v. District of Columbia Dep't of Employment Servs.*, 717 A.2d 909, 912 (D.C. 1998) (citations omitted). *See also Rafferty v. District of Columbia Zoning Comm'n*, 583 A.2d 169, 178 (D.C.1990) (declining to consider a notice argument that had not been made to the Zoning Commission); *Dietrich v. District of Columbia Bd. of Zoning Adjustment*, 320 A.2d 282, 287 (D.C.1974) (refusing to allow the petitioners to raise arguments on appeal that had not been considered by the Board of Zoning Adjustment).

There are many good reasons to follow this general rule in this case. If failure to comply with this regulation would, indeed, have precluded the Commission from considering the application, there ought to be strong incentives to raise the claim at the outset. An enormous amount of time and effort has been invested in conducting and reviewing these proceedings, and both administrative and judicial efficiency would be frustrated if we concluded at this late date that there should not have been a hearing in the first place. Moreover, petitioners have not convinced us that this is a question of subject-matter jurisdiction which may be raised for the first time on appeal. *See* D.C.Code § 2–509 (2001) (portion of Administrative Procedure Act governing contested cases); D.C.Code § 6–641.01 (2001) (powers of Zoning Commission).

■ Section 2406.5 and its neighboring regulations set forth requirements "for processing" a PUD application, 11 DCMR § 2406.1, but we do not know how the Zoning Commission would apply those regulations in these circumstances. *See 1330 Connecticut Ave.*, 669 A.2d at 714–15 (deferring to Commission's interpretation of predecessor to § 2406.5). The Commission might well decide that Lot 806 is not part of the area to be developed.[7] The Commission might also decide that § 2406.5 is not a "rule governing subject-matter jurisdiction," *Eberhart v. United States*, 546 U.S. 12, 13, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005), but rather a "nonjurisdictional claim-processing rule[ ]," *id.* at 16, 126 S.Ct. 403, which embodies a requirement that may be "forfeited if the party asserting the rule waits too long to raise the point." *Kontrick v. Ryan*, 540 U.S. 443, 456, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004). Forfeiture is likely to occur if the party first raises the point after it "has litigated and lost the case on the merits." *Id.* at 460, 124 S.Ct. 906.

"The Commission has other mechanisms for assuring that consideration will be given to the effect of any proposed modifications upon neighboring property owners without interpreting the regulations as pe-

7. Intervenor Schwartz has made a plausible argument that Lot 806 is not included in "the area to be developed. . . ." He argues that "[t]he PUD modification was to the use of the structure owned by the hotel, and not to the Hotel Facilities Premises. . . ." Those premises would still be used for essentially the same purposes—to provide parking, a restaurant, and a health club. In that sense, the underground premises would not be "developed." Whether the long-term lease permits BRE/Watergate to use those premises to support a cooperative-apartment building instead of a hotel is a question that was not before the Zoning Commission and is not before us. See note 6, *supra.*

titioner[s] suggest[ ]." *1330 Connecticut Ave.*, 669 A.2d at 715. The residents of Watergate East had ample notice of the proposed PUD modification. The Commission even made allowances for Watergate East to gain party status by postponing the January 29, 2004, hearing date. The Commission only went forward with the March 1, 2004, hearing when it could assure itself that the interests of the residents of Watergate East were represented by two committees, the Committee of Concerned Owners of Watergate East, which supported the application, and the Watergate East Committee Against Hotel Conversion to Co-op Apartments, which opposed it. The procedures followed by the Commission did not threaten the interests of justice, and we fail to see any "exceptional circumstances" that would justify entertaining this newly-raised procedural claim. *See Hisler v. District of Columbia Dep't of Employment Servs.*, 950 A.2d 738, 744 (D.C.2008) ("[T]he general rule is that even jurisdictional questions must be put to agencies before they are brought to the reviewing court." (internal quotation marks and citation omitted)); *Goodman v. District of Columbia Rental Housing Comm'n*, 573 A.2d 1293, 1301–02 & n. 21 (D.C.1990) (discussing "exceptional circumstances").

#### 2. Adoption of the Applicant's Proposed Order

▮ Petitioners claim that the Commission failed to conduct an independent review of the evidence and failed to exercise independent judgment, asserting that it adopted the applicant's proposed findings of fact, conclusions of law, and decision nearly verbatim. We have held that "[a] stricter review of the record is in order when a trial judge adopts, verbatim, the proposals of one party." *District Concrete Co. v. Bernstein Concrete Corp.*, 418 A.2d 1030, 1035 (D.C.1980). *See also In re*

*Baby Boy C.*, 581 A.2d 1141, 1144 n. 1 (D.C.1990). In such circumstances, we review the record to ensure that the " 'findings and conclusions ultimately represent the judge's own determinations.' " *District Concrete*, 418 A.2d at 1035 (quoting *Sullivan v. Malarkey*, 392 A.2d 1057, 1061 (D.C.1978)). "This principle is applicable to administrative settings ..." as well. *900 G Street Assocs. v. Dep't of Hous. & Cmty. Dev.*, 430 A.2d 1387, 1392 n. 1 (D.C. 1981).

▮ The Commission did not accept uncritically the findings tendered by the applicant. Although the majority of paragraphs were adopted verbatim from the applicant's proposals, the Commission added sentences and phrases, changed sentence structure, referenced the applicable regulations, changed the grammar, and, in some places, added entirely new paragraphs. Under these circumstances, we see no reason to doubt that the Commission's findings and decision represent its own considered conclusions. *See Anderson v. Bessemer City*, 470 U.S. 564, 572–73, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (noting that the issued findings "vary considerably in organization and content from those submitted by petitioner's counsel"); *see also In re Baby Boy C.*, 581 A.2d at 1144 n. 1 ("[T]he changes made by the trial court, although minor, indicate that the findings and conclusions ultimately represent the judge's own determinations." (internal quotation and citation omitted)). We therefore apply our normal standard, reviewing to ensure that the challenged findings are supported by substantial evidence. *Cf. Anderson*, 470 U.S. at 573, 105 S.Ct. 1504 ("There is no reason to subject those [trial court] findings to a more stringent appellate review than is called for by the applicable rules.").

### 3. Cross-examination

The District of Columbia Administrative Procedure Act allows parties in contested cases[8] the right to "conduct such cross-examination as may be required for a full and true disclosure of the facts." D.C.Code § 2–509(b) (2001). We have explained that

> [t]he agency, like a trial court, should permit cross examination to explore any matters which tend to contradict, modify, or explain testimony given on direct. Matters beyond the scope of direct examination are properly left to the opposing party's case-in-chief. In its application of these principles, the agency has broad discretion in regulating the nature, scope and duration of cross-examination.

*Cathedral Park,* 743 A.2d at 1250 (internal quotations and citations omitted).

Petitioners complain that the chairperson of the Commission on three occasions precluded them from exploring topics on cross-examination. In the first two instances, petitioners' counsel began to cross-examine the applicant's witnesses about the funding of some related litigation in Delaware and about how the proposed changes to the health club would affect elderly persons with disabilities. Neither subject had been broached on direct examination, and the chairperson instructed the attorney to move on to other topics. The chair also reminded the attorney that he would be allowed to raise these topics during his own case. These rulings conform to this court's holding that "[m]atters beyond the scope of direct examination are properly left to the opposing party's case-in-chief." *Cathedral Park,* 743 A.2d at 1250. In the third instance the chair curtailed questioning of marginal relevance. There was no abuse of discretion here.

### C. Substantive Arguments

### 1. The Approved Modifications Do Not Interfere with Vested Interests

Throughout their brief petitioners claim to have a "vested interest" in the current balance of uses within the PUD that should prevent conversion of the Hotel property to co-operative apartments. Indeed, petitioners assert that by approving the modification to the Hotel property, the Commission is "unilaterally realign[ing] private rights absent a legitimate state interest," and that this amounts to an unconstitutional taking of private property. There is no merit in this argument.

There is "no vested right in zoning classifications." *Foggy Bottom,* 639 A.2d at 583 (citing *Aquino v. Tobriner,* 112 U.S.App. D.C. 13, 16, 298 F.2d 674, 677 (1961)); *see also Scholtz P'ship v. District of Columbia Rental Accommodations Comm'n,* 427 A.2d 905, 918 (D.C.1981) ("A vested right must be more than a mere expectation based on the anticipated application of existing law."); *Foggy Bottom Ass'n v. District of Columbia Office of Planning,* 441 F.Supp.2d 84 (D.D.C.2006) (rejecting a takings claim based on alleged failure of Zoning Commission and the Office of Planning to enforce their regulations and a previous order). Indeed, the purpose of PUDs is to permit flexibility, *see* 11 DCMR § 2400.2, and the ability to modify a PUD is consistent with that purpose. This court held, in *Foggy Bottom,* that the Commission was allowed to balance the loss of existing amenities against

---

**8.** Public hearings on second-stage PUD applications, such as PUD modifications, should be conducted as a "contested case." 11 DCMR § 2408.5. *See also Hotel Tabard Inn v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 747 A.2d 1168, 1176 (D.C.2000) ("[I]t is settled that a PUD proceeding is a contested case....").

the gains to be realized from the proposed new amenities or public benefits. 639 A.2d at 583. The end result was elimination of previous PUD characteristics in favor of new ones.

Because there are no vested property rights at risk, we reject petitioners' suggestion that there has been an unconstitutional taking of private property by the government. A "taking" is defined as "[t]he government's actual or effective acquisition of private property either by ousting the owner or by destroying the property or severely impairing its utility." BLACK'S LAW DICTIONARY 1493 (8th ed. 2004); *see also Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) (describing four types of takings); *Mamo v. District of Columbia*, 934 A.2d 376 (D.C.2007) (owner of franchise business which occupied land taken by the District of Columbia was not entitled to compensation for business losses, goodwill, and other such consequential damages); *Arthur v. District of Columbia*, 857 A.2d 473, 491 (D.C.2004) (discussing Supreme Court decisions distinguishing between a "physical taking" and a "regulatory taking").

The petitioners obviously are not being ousted from their apartments, and their property is not being destroyed. The government is not "acquiring" anything—a willing buyer has contracted to purchase the Hotel property from a willing seller. Moreover, petitioners are not being restricted from making customary uses of their own property. They claim, instead, that their dwellings will be less valuable to them—that they will enjoy living at the Watergate less—if the Hotel is replaced. We rejected a similar claim in *Dupont Circle Citizens Ass'n v. Barry*, 455 A.2d 417, 423 & n. 26 (D.C.1983) (approval of a construction permit to build on vacant land in an historic area of the city did not amount to a taking or otherwise "threaten to affect any constitutionally protected interests in a concrete manner"). *See also Embassy Real Estate Holdings, LLC v. District of Columbia Mayor's Agent for Historic Preservation*, 944 A.2d 1036, 1053 (D.C.2008) (rejecting developer's argument that diminished margin of profitability due to designation of former embassy as an historic landmark constituted a taking); *Hornstein v. Barry*, 560 A.2d 530, 537 (D.C.1989) (en banc) ("diminution in property value, standing alone, does not establish a taking").

Petitioners nevertheless assert that they have "reliance interests"—that they bought their property with the understanding that the Hotel would continue to remain part of the Watergate PUD.[9] As we have explained, however, PUDs are not immutable arrangements. In fact, the zoning regulations contain procedures for modifying PUDs. Just as there are no vested rights in the continuation of a zoning classification, the residents of the Watergate complex had no reason to expect—in other words, no reasonable reliance interest—that the Watergate PUD would remain unchanged. *Cf. Embassy Real Es-*

---

9. The Commission heard conflicting evidence about whether the Hotel was economically viable and found "there is no guarantee that the existing hotel will remain in operation. The Commission further [found] that the hotel has lost its competitive position in the hotel market to newer, better-located hotels." Although petitioners and BRE/Watergate renew the economic debate in this court, it suffices to say that there was substantial evidence to support the Commission's view. As we pointed out above, "[i]f there is substantial evidence to support the [Commission's] finding, then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the [Commission]." *Brown v. District of Columbia Bd. of Zoning Adjustment*, 486 A.2d 37, 52 (D.C.1984) (en banc) (quotation omitted).

*tate Holdings*, 944 A.2d at 1053–55 (affirming determination that petitioner's investment-backed expectations were not reasonable). If there had been a covenant restricting use of the Hotel property, then the petitioners might have a more legitimate expectation that the Hotel would remain.[10] But the petitioners admit that there are no covenants restricting use of the Watergate properties.[11]

To the extent the petitioners are suggesting that the "approval [of all PUD owners] is necessary to governmental change in an established PUD," their position is contrary to law. The Commission recognized that an applicant "is not required to secure the consent of all property owners for modification of the PUD. The Zoning Regulations do not require the consent of owners and, in practice, the Commission has not required unanimous consent of the owners of property within a PUD before approving a modification." We must defer to the agency's interpretation of the zoning regulations because it is not inconsistent with the regulations or plainly erroneous. Indeed, we previously have rejected an argument "that the process must be terminated if any owner within the PUD does not consent to the application for modification." *1330 Connecticut Ave.*, 669 A.2d at 713.

### 2. Failure to Consider the Hotel an "Amenity"

Petitioners also contest the Commission's finding "that the hotel was not an amenity to the overall project, as amenities are now defined and considered in Chapter 24 of the Zoning Regulations." The Commission explained that "[w]hile the hotel may have been discussed in marketing and newspaper accounts as an amenity, that term was not incorporated into the Regulations until much later." *Compare* D.C. Zoning Reg. § 7501.1 (1962) (containing no reference to amenities) *with* D.C. Zoning Reg. § 7501.1 (1969) (requiring a PUD to provide "a living and/or working environment and *amenities* superior to those" available through application of the regular zoning regulations) (emphasis added) *and* 11 DCMR § 2403.5 (2003) ("[T]he Commission shall also evaluate the specific public benefits and project amenities of the proposed development...."). Given this history of evolving regulations, the Commission's finding "that the hotel *was* not an amenity to the overall project" (emphasis added) is a rational conclusion based upon substantial evidence.

Current regulations require the Commission to evaluate the specific public benefits and project amenities provided to the occupants and immediate neighbors of the PUD or to the public in general. 11 DCMR §§ 2403.5, 2403.7. "A project amenity is one type of public benefit, specifically a functional or aesthetic feature of the proposed development that adds to the attractiveness, convenience, or comfort of the project for occupants and immediate neighbors." 11 DCMR § 2403.7. The following are examples of categories in which public benefits and project amenities may be exhibited: urban design, architecture, open spaces, preservation of historic buildings, landscaping, creation of jobs, safe

---

10. A restrictive covenant is a "private agreement ... that restricts ... the uses to which the property may be put." BLACK's LAW DICTIONARY 393 (8th ed. 2004); *see also District of Columbia Pres. League v. Dep't of Consumer & Regulatory Affairs*, 646 A.2d 984, 986 (D.C. 1994) (describing a restrictive covenant as "ensur[ing] that any future development of the site at issue will be in conformity with the present structure").

11. Because there are none, we do not consider whether restrictive covenants might limit the authority of the Commission to approve a PUD modification.

and effective transportation, affordable housing, and environmental benefits. 11 DCMR § 2403.9.

■ In any event, this semantic debate makes no difference in this case. Even if the Hotel were considered to be an amenity as currently defined, it would not be insulated from change. The Commission would still have the authority to balance the loss of the amenity against the gains to be realized from the proposed modification. *See Foggy Bottom*, 639 A.2d at 586–87 (evaluating the loss of some amenities in the IMF PUD against the gain of new, proposed amenities). In essence, having the Hotel classified as an "amenity" would only entitle the petitioners to the application of a balancing test. *See* 11 DCMR §§ 2403.5 ("[T]he Commission shall also evaluate the specific public benefits and project amenities of the proposed development. . . .") & 2403.8 ("In deciding a PUD application, the Commission shall judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case.")

We appreciate that one of the great attractions of the Watergate complex is the concept of an integrated community combining a mixture of uses, and the Hotel undoubtedly adds several features enjoyed by many of its neighbors—including the petitioners. The Commission appreciated this as well. Although it did not call the Hotel an amenity, the Commission in effect treated it as such, balancing the loss of various features of the Hotel against the gains to be realized from the proposed modification. Indeed, the Commission al-

tered the balance somewhat, approving the modification only after requiring the applicant to provide a health club and a restaurant—facilities of the Hotel which petitioners claim they use as residents of the apartment buildings. These requirements preserved certain of the most important benefits afforded by the Hotel to its neighbors.[12]

The Commission concluded that the proposed modification would not change the essential nature of the Watergate PUD. "While the mixed-use character of the PUD was integral to its approval, the loss of the hotel use will not change the project's mixed-use character. Because of the continued office building, retail, restaurant, and health club uses, the proposed modification will not result in a project that is purely residential." "Moreover," the Commission noted, "under current Zoning Regulations, the Watergate Hotel would have required special exception approval, whereas the proposed apartment house use can be commenced as a matter of right. It is counterintuitive to suggest that the preservation of a use that now requires a special except[ion] should be favored over the establishment of a use that is permitted by right." In sum, "[t]he amenities and benefits provided are a reasonable trade-off for the change in use. . . ." Petitioners obviously do not agree with this conclusion, but the Zoning Commission is charged with, and experienced in, conducting balancing of this sort, and we defer to its expertise. *Dupont Circle Citizens Ass'n*, 426 A.2d at 332.

### 3. The Hotel as a "Major" or "Primary" Use[13]

Petitioners argue that the Hotel is a "major component" of the PUD—a "pri-

---

**12.** The applicant must also contribute $250,000 to assist in providing 3,000 square feet of affordable housing.

**13.** Petitioners attach only the loosest of definitions to the term "primary use": "a use that has been relied upon by many of the existing residents of the Watergate PUD in purchasing

mary use"—and its elimination would radically alter the mix of uses. In making this argument, they assert that "the Commission must treat the modification application in the same way that it reviews the initial PUD" and that major changes to a PUD cannot be "permitted without sufficient cause, if at all...."

 Changes to existing PUDs have been allowed in the past, effectively refuting the suggestion that changes to a PUD cannot be "permitted ... at all." *See 1330 Connecticut Ave.,* 669 A.2d 708 (upholding Commission approval of modification to an existing PUD); *Foggy Bottom,* 639 A.2d 578 (upholding approval of changes to the International Monetary Fund PUD); note 4, *supra* (detailing changes to the Watergate PUD). Furthermore, applications for modifications to an existing PUD must "meet the requirements for and be processed as a second-stage application...." 11 DCMR § 2409.9. There is no exception or different process for proposed modifications that affect a "primary use."

Petitioners rely heavily on *Gray v. Trustees, Monclova Township,* 38 Ohio St.2d 310, 313 N.E.2d 366 (1974), in asserting that a "major use" of a PUD cannot be changed. However, that decision states, more modestly, that "the reasonable expectations of persons that the use of these areas [referring to open spaces and recreational areas] will not be radically altered after they become residents of the PUD *are relevant evidence* when such an altera-

tion is challenged." *Id.* at 369 (emphasis added).[14] Although *Gray* invalidated an amendment to a PUD, that decision rests upon a distinction between "legislative zoning" and "administrative action" that is not relevant here, and its analysis seems to be largely outmoded in Ohio. *See State ex rel. Marsalek v. South Euclid City Council,* 111 Ohio St.3d 163, 855 N.E.2d 811, 814 (2006) (distinguishing *Gray* and another decision; "the acts in those cases were found to be legislative because they effected a zoning change to the properties"); *Comm. for the Referendum of Ordinance No. 3844–02 v. Norris,* 99 Ohio St.3d 336, 792 N.E.2d 186, 190–92 (2003) (and cases discussed therein); *Zonders v. Delaware County Bd. of Elections,* 69 Ohio St.3d 5, 630 N.E.2d 313, 319 (1994) ("where specific property is already zoned as a PUD area, approval of subsequent development as being in compliance with the existing PUD standards is an administrative act...."). Most importantly, *Gray* is not binding upon us, and we do not find it persuasive.

 We do agree with a portion of petitioners' argument—that change to the PUD cannot be "permitted without sufficient cause." The question is how much "cause" is sufficient. In this case, the Commission decided to allow change to the existing PUD, concluding that the modification offered several public benefits. Among those benefits are an increase in the housing stock in an area that badly

their units." This argument therefore is a reiteration of the "reliance" argument we have rejected above. Furthermore, there is substantial evidence showing that the residents of the PUD did not use the Hotel frequently. On behalf of the owners of the Hotel, Bill Stein testified that in 2003 "less than one percent of the total revenue of the hotel [approximately $150,000] came from residents of the immediate community." Most of that revenue was from food or beverage or catering, services which would still be avail-

able under the new plan through the restaurant required by the Commission.

14. *Gray* also undercuts petitioners' "vested rights" argument, recognizing "that one who acquires and improves property has no contractual or constitutional right to have the zoning which existed in the area at the time of the improvement remain the same." 313 N.E.2d at 369.

needs it.[15] Although it recognized that the "hotel was an important component of the project as originally conceived[,]" the Commission found that "[t]he amenities and benefits provided [by the modification were] a reasonable trade-off for the change in use...."

Petitioners also protest that the Commission did not consider the PUD "as a unit." To the extent they suggest that the "unit" must remain static, we have already rejected that argument. Moreover, its order reveals that the Zoning Commission recognized the interconnectedness of the PUD when conducting its balancing function, and the end result after the modifications will still be a mixture of uses. We reject petitioners' implicit invitation for us to weigh the evidence anew.

Even if we focus upon the intent and purposes of the first-stage approval, as petitioners urge us to do, there is still substantial evidence to support the Commission's decision. The original Watergate PUD was to have approximately 1,600 dwelling units. Today, however, there are only approximately 650. By adding the 133 proposed units, the modified PUD would come closer to, yet still fall well below, the originally-contemplated number of residential units. Ultimately, all of this information (including the loss of the Hotel) must be balanced by the Zoning Commission pursuant to 11 DCMR § 2403.8. "As a court of review, we must acknowledge that this question is better answered by the Zoning Commission which has the expertise to make such a broad justification based on elements of fact, policy, and

experience." *Dupont Circle Citizens Ass'n,* 426 A.2d at 332.

### 4. Consistency with the Comprehensive Plan

The Commission may not approve the application unless it finds that the "proposed PUD is not inconsistent with the Comprehensive Plan and with other adopted public policies and active programs related to the subject site." 11 DCMR § 2403.4. The petitioners argue that the proposed modification violates two provisions of the city-wide Comprehensive Plan, namely 10 DCMR §§ 1331 and 1333. Section 1331.3 recognizes that "additional hotels will be needed to fulfill increased demand" in Ward 2, and § 1333.1(a) notes that the District should "[e]ncourage continued improvement of existing hotels[.]"

The Commission acknowledged that encouraging hotel development was part of the Ward 2 portion of the Comprehensive Plan. It found, however, "that focusing on the particular sections of the ... Plan concerning existing hotels, without reference to other parts ..., does not yield a complete picture of the goals, objectives, and policies of the Plan." Reading the plan as a whole, as the Commission concluded it must, it found a stronger emphasis placed on housing than hotel development, and that hotel development was not necessarily intended for the Foggy Bottom neighborhood of Ward 2.

The Commission's decision was not inconsistent with the regulations. To the

---

15. The Comprehensive Plan expresses much concern about changes in the housing available in the Ward 2 area. Although the Plan comments that the ward's housing stock continues to improve, 10 DCMR § 1303.6, it also notes that housing in the Foggy Bottom neighborhood has decreased due to institutional growth, commercial expansion, and ris-

ing housing costs. 10 DCMR § 1303.7. One of the goals in the Comprehensive Plan for Ward 2 is to "[s]timulate production of new and rehabilitated housing to meet all levels of need and demand and to provide incentives for the types of housing needed at desired locations[.]" 10 DCMR § 1304.1(a).

contrary, the Comprehensive Plan recognizes the need to "[s]timulate production of new and rehabilitated housing to meet all levels of need and demand" in Ward 2, 10 DCMR § 1304.1(a), and expresses concern "about the impact of hotel development on nearby residential areas, especially ... in Foggy Bottom...." 10 DCMR § 1331.4. Although the Plan does mention that hotel growth is a key objective in Ward 2, it proposes that the growth take place at and around the new convention center at Mount Vernon Square. *See, e.g.,* 10 DCMR §§ 1333.1(a)(5) and 1331.5.

The Comprehensive Plan also sets goals of "[i]ncreasing the quantity and quality of employment opportunities in the District" and strengthening the District's role as an economic hub. 10 DCMR § 101.1(b) & (h). The Commission found that new residents would generate significant local income, property, and sales tax revenues for the District; the employees of the Hotel would find employment at other area hotels; and the new residents' high incomes and purchases would create retail and service jobs. Although disputed, these findings were supported by substantial evidence. An expert testified that the changes would create 453 new jobs, and that there would be a $32 million increase in consumer expenditures from the new residents as well as increased taxes in the amount of $4.2 million a year.

The Commission also considered the modification's effect on traffic in and around the Watergate complex. Although such considerations are not a part of the Comprehensive Plan, "measures to mitigate adverse traffic impacts" are considered "benefits" and "amenities" in the PUD evaluation process, 11 DCMR § 2403.9(c), and the Commission made several relevant findings. For example, it found that after conversion of the Hotel to co-op apartments there would be fewer vehicle trips during peak driving hours. This finding is based on the testimony of traffic consultants from Wells & Associates, whose report was confirmed by the District Department of Transportation. The petitioners submitted the testimony of an opposing expert, but the Commission found his methodology and findings flawed.

## IV. Conclusion

We recognize that the petitioners feel strongly about changes to the Watergate complex and that there may be substantial evidence supporting some of their factual arguments. However, applying our standard of review to the record created at the hearing, we conclude that the Commission's order is clearly supported by substantial evidence. Moreover, there was no procedural error warranting reversal. Accordingly, the Order of the Zoning Commission is hereby

*Affirmed.*